CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

DEC 20 2017

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

BILLY D. WATLINGTON, JR.,           )
            Plaintiff,               )        Civil Action No. 4:16-cv-00046
                                     )
v.                                   )
                                     )        REPORT & RECOMMENDATION
NANCY A. BERRYHILL,                  )
ACTING COMMISSIONER OF               )
SOCIAL SECURITY,                     )        By:    Joel C. Hoppe
            Defendant.               )        United States Magistrate Judge

Plaintiff Billy D. Watlington Jr. asks this Court to review the Acting Commissioner of

Social Security's ("Commissioner") final decision denying his application for disability

insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–434. The

case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 6. Having considered the

administrative record, the parties' briefs and oral arguments, and the applicable law, I find that

the Commissioner's final decision is supported by substantial evidence and must be affirmed.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*,

88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); 20 C.F.R. § 404.1520(a)(4). The applicant bears the burden of proof at steps one through

four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the

applicant is not disabled. *See id.*

## II. Procedural History

Watlington filed for DIB in August 2012, alleging disability because of leg pain, hand

numbness, a back injury, and "continued treatment and pain medications" after surgeries on his

lower back and shoulder since at least July 27, 2012, the same date he left his most recent job.

*See* Administrative Record ("R.") 77, 78, 167, 196, ECF No. 8-1. The Commissioner rejected

Watlington's claim initially in September 2012, and on reconsideration in April 2013. R. 76, 86.

In August 2014, Watlington appeared with counsel for an administrative hearing before ALJ H.

Munday. R. 32–74. Watlington, his mother-in-law, and a vocational expert ("VE") all testified at

the hearing. R. 36–64, 64–71.

ALJ Munday issued an unfavorable decision on February 20, 2015. R. 10–28. She found

Watlington had "the following severe impairments: recurrent lumbar herniated disc with right

lumbar radiculopathy, lumbar spinal stenosis, degenerative disc disease of the lumbar/thoracic

spine, post laminectomy syndrome, hypertension, obesity, and bilateral carpal tunnel

syndrome."[1] R. 12. None of these impairments, alone or combined, met or medically equaled

one of the presumptively disabling impairments listed in the Act's regulations. R. 14–15, 20–21.

The ALJ next evaluated Watlington's residual functional capacity ("RFC")[2] based on all of his

medical impairments. R. 15–21. She determined that Watlington could physically perform "a

---

[1] ALJ Munday also found that all of Watlington's other medical conditions, including anxiety and a
distant "history of a right shoulder rotator cuff repair," were non-severe impairments. R. 13. Watlington
does not challenge this finding on appeal. *See generally* Pl.'s Br. 4–9, ECF No. 11.

[2] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her
impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

range of light work"[3] that involved never climbing ladders, ropes, or scaffolding, and at most

frequent balancing; occasional stooping, kneeling, crouching, crawling, or climbing ramps/stairs;

occasional pushing/pulling with the right lower extremity; frequent reaching overhead, handling,

fingering, or feeling; and occasional exposure to vibrations, workplace hazards, extreme cold,

humidity, or wetness. R. 15. The ALJ also found that Watlington should be limited to jobs

involving "simple, routine tasks." *See* R. 15. This RFC ruled out Watlington's return to all of his

past relevant work. R. 21. Finally, relying on the VE's testimony, the ALJ concluded that

Watlington had not been disabled between July 27, 2012, and February 20, 2015, because he still

could perform several "unskilled light" occupations that were available in significant numbers

nationally and in Virginia, such as marker, router, and rental clerk. R. 22–23. The Appeals

Council denied Watlington's request for review, R. 1–4, and this appeal followed.

### III. Discussion

Watlington makes two arguments in his brief, both of which focus on his lower-back

impairments and related symptoms. *See* Pl.'s Br. 3–9. First, he asserts that those impairments

met Listing 1.04(A), which sets out the criteria for certain presumptively disabling spinal

disorders. *Id.* at 5–6, 8. Second, Watlington argues that the ALJ's RFC for "light work" is flawed

because it does not reflect two treating physicians' opinions and Watlington's statements

describing his chronic pain and minimal daily activities. *See id.* at 6, 7–9. At oral argument,

Watlington also argued that the ALJ's RFC determination was flawed because she failed to

consider the degree to which medication side effects impaired his ability to stay on task in a

---

[3] "Light work" involves lifting no more than twenty pounds at a time, but frequently lifting objects
weighing ten pounds. 20 C.F.R. § 404.1567(b). A person who can meet these lifting requirements can
perform light work only if he also can "do a good deal of walking or standing, or do some pushing and
pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1990).

competitive work environment. *See* R. 43, 48–49, 51, 70–71. Watlington's arguments are not
persuasive.

A.    *The Relevant Evidence*

    1.    *Treatment Records*

        a.    *Southside Orthopedic Spine Center & Pain Solutions*

In May 2011, Watlington underwent a right-sided discectomy to remove a large herniated
disc at L5-S1. R. 335. His "initial response was excellent," R. 342, and three months later,
surgeon Leon Abram, M.D., cleared Watlington to return to his normal activities as long as he
was "cautious about excessive axial loading of the spine," especially when "any twisting or other
torsional activities [were] involved." R. 349. Watlington later "developed recurrent right leg
pain," "mild weakness," and "some sensory disturbance" after he got back on his motorcycle too
soon after surgery. R. 335; *see* R. 342–43. Those symptoms "increased in intensity" and within a
few months "no longer responded to standard nonsurgical treatment." R. 335. An MRI showed
"evidence of a large recurrent herniated disk on the right at LS-51, consistent with the patient's
findings on examination." R. 335; *see also* R. 342–43.

On December 8, 2011, Dr. Abram performed a revision discectomy and fusion at L5-S1.
R. 335; *see also* R. 340, 342–43. One week later, Watlington told Dr. Abram that his right leg
symptoms had "completely dissipated," but he was now experiencing similar symptoms on the
left side. R. 334. On examination, Watlington had "a positive seated straight leg raise on the left"
with "[n]o cross straight leg raising noted on the right." R. 334. Dr. Abram prescribed pain
medication and ordered an MRI "to rule out left-sided disc herniation or nerve root
compression." R. 334. The MRI showed "no evidence for nerve root irritation or inflammation"
and "no evidence for structural abnormalities as a source of [his] left-sided symptoms." R. 330.

Dr. Abram opined that Watlington was likely experiencing symptoms of inflammatory process consistent with his recent surgery. R. 330.

Watlington saw Dr. Abram about once every eight weeks between January and June 2012. R. 320–21, 323–24, 325–26, 327–28. He consistently reported that his pain and other symptoms were improving with daily prescription medications, and there is no indication that Watlington reported any adverse side effects from those medications. *See* R. 321, 323–24, 325–26, 327–28. Dr. Abram occasionally encouraged Watlington "to increase his activity," R, 324, 328, but "to be cautious about bending, lifting, and twisting," R. 324. The surgeon's treatment notes from this period do not explicitly limit the amount of weight that Watlington could lift or carry. *See* R. 321, 324, 326, 328, 330, 334, 335, 339–43, 347, 349, 352.

In early June 2012, Watlington told Dr. Abram that while he still had "some ongoing" lower-back pain, he was "functioning quite well" on daily pain medications and "continue[d] to work full time full duty without specific restrictions." R. 321 ("He is active in many of his normal activities but he still has some discomfort [that] can interfere with activities and is persistent. . . . He will continue to stay active."). New X-rays showed that the surgical hardware was in good position. R. 321. Dr. Abram suspected that most of Watlington's "residual symptoms [were] related to a combination of permanent nerve damage that occurred prior to the operation as well as new forces and loading of the L3-L4 and L4-L5 facet joints and discs, now that he ha[d] a lumbosacral fusion present." R. 321. He referred Watlington to his colleague Eduardo Fraifeld, M.D., to determine whether "a long acting narcotic medication would be more beneficial than the continued use of short acting preparations." R. 321.

Watlington established care with Dr. Fraifeld on July 23, 2012. R. 313–19. He reported experiencing constant "moderate to severe" pain in his middle and lower back that "occasionally

radiate[d]" into the right thigh. R. 313. The pain increased with sitting, lifting, bending, walking, and twisting, R. 313, but improved with daily medications (Lyrica, Naprosyn, oxycodone) and rest, R. 314. On examination, Dr. Fraifeld observed that Watlington walked with a normal gait, had normal reflexes and full (5/5) muscle strength throughout, and exhibited full range of motion without reported pain or tenderness in his thoracic-lumbosacral spine and pelvis. R. 316–17. His straight-leg raising test was negative. R. 317. Dr. Fraifeld instructed Watlington to increase Lyrica, prescribed methadone as needed, and gave Watlington a transcutaneous electrical nerve stimulation ("TENS") unit to help his neuropathic pain. R. 318.

On July 31, 2012, Watlington returned to Dr. Abram's office for a "repeat evaluation" and "to talk to the doctor about disability." R. 310–11. He reported that although his symptoms "remained stable," he "continue[d] to have significant pain preventing him from lifting beyond 10 pound lifting [sic] restriction." R. 311. It does not appear that Dr. Abram examined Watlington during this visit. *See* R. 311–12. He did note, however, that Watlington had "essentially reached maximum medical improvement and remains with limitations," including that he "restrict bending, lifting, and twisting with a 10 pound lifting limit." R. 312. At his next visit with Dr. Fraifeld on August 6, 2012, Watlington reported similar pain symptoms with some improvement, R. 306, but complained that his new medications caused "minor adverse" side effects, R. 309, including "some mild sleepiness," R. 306. Dr. Fraifeld noted that those side effects would likely "go away if [he] develop[ed] more tolerance to [the] medication." R. 309. He instructed Watlington to continue his medications, to increase his "exercise and activity level," and to use the TENS unit, which Watlington said helped ease his symptoms, as much as possible. R. 306, 309. It does not appear that Dr. Fraifeld examined Watlington during this visit. R. 308–09.

On September 4, 2012, Watlington told Dr. Abram that he still had "some lower back pain and some occasional right leg pain," but that Dr. Fraifeld was providing "adequate medical management for his residual pain." R. 304. A physical examination failed to "show any new evidence of radiculopathy." R. 304. Dr. Abram instructed Watlington to continue under Dr. Fraifeld's care and to return in one year for his annual check-up. R. 304. It appears that Watlington saw Dr. Fraifeld only once more, on October 3, 2012. *See* R. 355–59, 429. He said that his back pain was "overall improved" and "relatively well controlled" by Lyrica, methadone, and the TENS unit. R. 355; *see also* R. 356, 358. He still had "significant breakthrough pain" and "pain related to activity," however. R. 355. Watlington specifically denied that his opioid pain medications made him feel drowsy or otherwise impaired his mental state. R. 355; *see also* R. 357 (denying changes in sleep pattern, irritability, disorientation, memory loss, and mood swings). On examination, Dr. Fraifeld observed that Watlington walked with a normal gait, had normal reflexes and full (5/5) muscle strength throughout, and exhibited full range of motion without reported pain in his thoracic-lumbosacral spine and pelvis. R. 357. His straight-leg raising test was again negative. R. 357. Dr. Fraifeld instructed Watlington to continue his medications, increase his activity level, and return for a routine follow-up visit in three months. R. 358.

On November 12, 2013, Watlington told Dr. Abram that he was "doing basically the same" as in September 2012, but that he still had a "significant amount of pain which prevent[ed] him from working at his normal job." R. 518. There is no indication that Dr. Abram examined Watlington on the November 2013 visit or that Watlington reported any adverse side effects from his pain medications. *See* R. 516–18. In June 2014, Dr. Abram completed an insurance company's "Attending Physician's Statement of Disability" in which he opined that

8

Watlington had been "totally disabled" since July 2012 and would not be able to perform any occupation in "the foreseeable future." R. 512–13. Dr. Abram completed a similar form on September 15, 2014, in which he opined Watlington was "unable to work due to" his diagnoses. R. 514. He did not examine Watlington on that date. R. 515.

> ### b.    *Piedmont Pain Medicine, P.C.*

On April 23, 2013, Watlington established care with pain-management specialist Larry Winikur, M.D. R. 429–33. He told Dr. Winikur that his post-operative symptoms had "not improved" under Dr. Fraifeld's care. R. 429–30. Watlington said that his current medications (Lyrica, methadone, naproxen, and Skelaxin) took "the edge off of his pain," but did not help at all when he was active. R. 429. The treatment notes do not document that any of these medications made Watlington feel drowsy, irritable, or otherwise impaired his mental state. R. 429, 433. On examination, Dr. Winikur observed that Watlington endorsed "[t]enderness to light palpation" and exhibited "decreased" range of motion in his back. R. 431. Watlington's spinal exam, however, showed "normal" range of motion without evidence of tenderness or muscle spasms. R. 432. Watlington walked normally and exhibited "normal stability, strength, and station" without signs of "weakness in all four extremities." R. 431. When examining Watlington's lower extremities, Dr. Winikur documented "[p]ainful and limited" range of motion and decreased (3/5) motor strength bilaterally. R. 432. "No gross sensory or motor deficits" were noted on the neurological exam. *Id.* Dr. Winikur changed some of Watlington's pain medications, including substituting Lortab for methadone, weaning him off Lyrica, and discontinuing Skelaxin, and instructed him to return in one month.

Watlington went to Dr. Winikur's clinic for routine follow-up appointments about once every two months between May 2013 and May 2014. *See* R. 434–37, 454–57, 458–61, 462–66,

472–76, 477–80. Each progress note from this period contains neurophysical exam findings identical to those Dr. Winikur recorded in the initial April 2013 treatment note discussed above. *Compare* R. 431–32, *with* R. 436–37, 456–57, 460–61, 464–65, 474–75, *and* 479–80. Watlington initially reported that one of the new medications (Lortab) did not relieve his pain and that he had started taking Skelaxin again because the drug controlled his muscle spasms. R. 434. In July 2013, Dr. Winikur recommended that Watlington undergo a spinal cord stimulator ("SCS") trial to see if the electronic device might reduce his chronic pain. *See* R. 438–39, 440–42. Dr. Winikur implanted the device on July 30 and removed it during an office visit on August 2, 2013. R. 443–44, 447–48, 449–53. Watlington told Dr. Winikur that the SCS "was effective for reducing his pain" during those three days and even allowed him "to be more active" while taking less opioid pain medication than usual. R. 450. *But see* R. 443 ("For the duration of the trial, you should not . . . [b]end, twist, stretch, or lift more than 5 pounds." (emphasis omitted)). Watlington did "not want to pursue a SCS" as a pain-management tool, however, because the tingling sensation "drove him absolutely crazy." R. 450, 451, 453. Dr. Winikur continued Watlington's medications (Norco, Lortab, Skelaxin, and naproxen) as previously prescribed. R. 450, 453. After this, Watlington consistently told Dr. Winikur that several daily doses of oxycodone, Skelaxin, and naproxen "helped" or "controlled" his chronic back pain without reported side effects. *See* R. 454, 458, 465, 472–75, 477. At the May 2014 visit, Watlington also said that he could "tolerate the pain and spasms enough to carryout [sic] his daily activities," but he repeated his earlier reports that the "pain worsen[ed] upon bending at the waist, lifting, pushing, pulling, squatting, and walking, standing, or sitting for extended periods." R. 477; *see* R. 434, 454, 458, 462, 467, 472.

On May 25, 2014, Dr. Winikur completed a physical RFC form offering his assessment of Watlington's spinal impairments and functional limitations. R. 423–28. He opined that "chronic pain and weakness" in both lower extremities significantly limited Watlington's ability to stand, walk, and sit upright for extended periods. *See* R. 424–25. Specifically, Watlington could stand for one or two hours, walk for one or two blocks at a time, and sit upright for less than six hours in an eight-hour day. *See* R. 424–25. Watlington did not need to lie down during the day, however. R. 425. Watlington could regularly lift/carry up to ten pounds, could rarely reach in any direction, and had undefined "difficulty" bending, squatting, kneeling, and "[t]urning any parts of the body." R. 425. Watlington should not travel alone "[d]ue to the CNS effects of his opioids, sedatives, and muscle relaxants," but Dr. Winikur did not identify any specific side effects or describe how they impaired Watlington's ability to function.[4] R. 426. Dr. Winikur described Watlington's "constant" back pain as "severe and disabling" and noted that he did not foresee him returning to "any type [of] work." R. 426–27.

Watlington also saw Dr. Winikur for a routine follow-up visit on August 14, 2014. R. 482–86. The administrative record contains two versions of the treatment note from this appointment. *See* R. 482–86 (original), 544–48 (revised), 549–50 (letter of explanation). The original treatment note shows a normal physical exam, including full (5/5) motor strength in both lower extremities and full range of motion in the spine, back, and legs without reported pain or tenderness. R. 484–85. The revised treatment note, which Dr. Winikur submitted to the agency in December 2014, paints a dramatically different picture of his patient. *See* R. 543–49. This record documents several abnormal findings on Watlington's physical exam, including:

---

[4] The Court assumes the phrase "CNS effects" refers to medication side effects which affect or impair the central nervous system. *See, e.g.*, *Lowery v. Colvin*, No. 4:13cv60, 2015 WL 1780870, at *16 (W.D. Va. Apr. 20, 2015).

- Back – paraspinal spasms bilaterally, painful range of motion, very tender to light palpation, moderate apparent muscle spasms;
- Musculoskeletal – normal stability, strength, and station (gait) but with "global weakness" in both lower extremities;
- Spine – decreased range of motion in forward flexion, extension, and lateral rotation; moderate swelling and tenderness; moderate amount of lumbar spasms;
- Lower extremities – decreased motor strength (3/5) bilaterally with weakness in his flexors, abnormal sensory examination in L4-5 dermatomes;
- Neurological – weakness, numbness, and decreased strength (+2/4) in both lower extremities.

R. 546–47. Both versions reflect Watlington's report that his "pain and spasms [were] tolerable" and that he could "be more active with" several daily doses of oxycodone, Skelaxin, and naproxen, as well as Dr. Winikur's instruction that Watlington continue taking those medications as prescribed. R. 482, 485, 544, 548. The notes do not document that Watlington reported any adverse medication side effects at this visit. *See* R. 482–85, 544–48.

   2.    *Examining & Reviewing Source Medical Records*

On September 26, 2012, David Williams, M.D., reviewed Watlington's records submitted to the state agency through September 4, 2012. R. 76–83. According to Dr. Williams, the treatment notes showed that Watlington's back condition and post-operative "discomfort" were responding to treatment and that he was "able to stand, walk, and move about without significant limitations." R. 85. Dr. Williams opined that Watlington could lift and/or carry ten pounds occasionally and less than ten pounds frequently, stand and/or walk for a total of two hours and sit for about six hours in an eight-hour workday, and occasionally stoop, kneel, crouch, crawl, and climb. R. 82–83.

On March 23, 2013, Watlington had a consultative physical examination with Salman Gohar, M.D. R. 409–13. Watlington told Dr. Gohar that he used to work as the manager of a medical facility, but "was laid off as a result of downsizing" in January 2012. R. 409. He said

that he could feed, bathe, and dress himself, but that he did not cook, clean, or do yard work;

instead, he spent "most of his day sitting in his chair watching TV." R. 410. On examination, Dr.

Gohar observed that Watlington walked normally and without discomfort, exhibited full (5/5)

strength, and had normal range of motion in his pelvis and both lower extremities. R. 411, 412.

His thoracolumbar spine allowed flexion to "about 50 degrees," extension to "about 20 degrees,"

lateral flexion to "about 15 degrees" bilaterally, right lateral rotation to "about 50 degrees," and

left lateral rotation to "about 15 degrees." R. 412. Dr. Gohar opined that "based on today's exam

and what he does on an every day basis," Watlington could stand/walk for "less than 6 hours"

and sit for "about 6 hours" during a normal eight-hour workday and could lift/carry "about 20

pounds occasionally and 10 pounds frequently." R. 412. Dr. Gohar did not put any limitations on

Watlington's postural activities. R. 412–13.

On April 4, 2013, Richard Surrusco, M.D., reviewed Watlington's updated records

submitted to the state agency through that date. R. 86–100. Dr. Surrusco agreed with Dr.

Williams's opinion that the available treatment notes showed Watlington's back condition and

post-operative "discomfort" were responding to treatment and that he was "able to stand, walk,

and move about without significant limitations." R. 100; *see* R. 85. Based on the updated

records, Dr. Surrusco opined that Watlington could lift and/or carry twenty pounds occasionally

and ten pounds frequently, sit for "about 6 hours" and stand and/or walk for "about 6 hours"

during a normal eight-hour workday, and occasionally stoop, kneel, crouch, crawl, and climb. R.

97–98.

In October 2014, ALJ Munday asked Kenneth Cloninger, M.D., to review all of

Watlington's available medical records and to offer his opinion as to Watlington's medical

conditions and physical limitations. R. 531–41. Dr. Cloninger opined that Watlington "would not

have been disabled" before March 23, 2013, but "met [L]isting 1.04A from 4-23-2013 until 8-14-2014," and "should be able to at least do light work after that last date." R. 538–39. Dr. Cloninger explained that his Listing opinion relied on Dr. Winikur's treatment notes from the same period showing Watlington had "severe weakness of both legs (3/5) [with] pain & limitation of range of motion of his legs and lumbar spine." R. 539. He also explained that Watlington "would no longer meet any listing" as of August 14, 2014, because Dr. Winikur's treatment note from that visit showed Watlington's "motor exam was 5/5, his sensory & reflex exams were normal," his "gait was normal[,] and he had no sciatic notch tenderness." R. 539; *see* R. 484–85 (original copy).

Dr. Cloninger also completed a physical RFC form identifying Watlington's "limitations as of 8-14-2014." R. 536. He opined that Watlington could frequently lift/carry ten pounds; occasionally lift/carry twenty pounds; frequently reach in any direction, balance, and climb stairs and ramps; occasionally stoop, kneel, crouch, and crawl; and never climb ladders or scaffolds, and he should have at most occasional exposure to unprotected heights and extreme temperatures. *See* R. 532–35. Dr. Cloninger explained that at least some of these restrictions were meant to accommodate the fact that Watlington "still has some low back and [right] leg pain" from his spinal surgeries. *See* R. 532–33, 538–39.

3.    *Watlington's Statements & Other Lay Evidence*

In August 2012, Watlington filled out an Adult Function Report and a Pain Questionnaire describing how his impairments affected his functional abilities and daily activities. *See* R. 185–92, 205–06. Watlington wrote that on an ordinary day he showered, used the TENS unit for an hour, ate cereal for breakfast, sometimes washed clothes, watched television, read on the computer, used the TENS unit for another hour, made a sandwich for lunch, sometimes walked

14

next door to visit his mother, sometimes fed his dogs and let them outside, took a nap, watched television again, and read before going to bed. R. 185–87. He could bathe and dress himself, but he had trouble bending down to tie his shoes. R. 186. Watlington did not do any yard work, but he did dust, do laundry, and wash dishes for two or three hours "a couple times a week." R. 187–88. Watlington also went shopping in stores and out to eat in restaurants once or twice a week. R. 188–89. He made conflicting statements about whether he still exercised on a Bowflex machine and walked on a trail three times per week. *Compare* R. 189, *with* R. 189–90.

Watlington said that his back pain limited most of his physical functions, including sitting, standing, walking, and lifting. R. 190. He estimated that he could walk "maybe ½ mile" before needing to stop and rest and noted that he could sit and stand for only "short periods of time due to pain." R. 190. Prescription pain medications and muscle relaxants relieved Watlington's symptoms, but also made him feel fatigued and irritable. R. 206. He made conflicting statements about whether the medications also limited his ability to concentrate or to complete tasks. *Compare* R. 206, *with* R. 190. In November 2012, Watlington's wife filled out a Third Party Function Report describing her husband's pain, daily activities, and functional limitations in similar terms. *See* R. 224–34.

At the administrative hearing in August 2014, Watlington testified that he last worked in July 2012 at a job that required him to lift up to fifty pounds and be on his feet for "six or more hours" per day. R. 39, 40. He left this job because he was laid off and had "some disagreements with management." R. 39–40. Watlington initially said that he did not think there were "any issues with [his] ability to perform the job," but quickly clarified that he was not "physically able to continue performing the job" after July 27, 2012. R. 39. Asked to describe how much he could physically do before "some symptoms set in," Watlington estimated that he could sit for fifteen

to twenty minutes, stand for twenty to thirty minutes, and walk seventy-five yards. R. 44–45. He

also noted that he had a weight-lifting "limitation of ten pounds" and that he feels a "little pain"

if he lifts "something in that weight range." R. 46. Prescription medications helped the pain, but

also made him feel drowsy and sluggish. R. 43, 51–52.

Watlington testified that he did "very little" housework and did not do any yard work or

go out to restaurants because "it just hurts" when he sits or stands for too long. R. 50, 52. He said

that on an ordinary day he got out of bed around 10:00 a.m., poured a bowl of cereal, and spent

most of his time watching television or napping. R. 48–49, 64. Sometimes he took "short trips"

to the grocery store or walked next door to his mother's house. R. 50. Watlington's mother-in-

law also testified that he did not do much housework and spent most days lying in his recliner or

on the couch. R. 57–58, 60–61.

B.    *Analysis*

1.    *Listing 1.04(A)*

Watlington first argues that his lower-back impairments met Listing 1.04(A). Pl.'s Br. 5–

6, 8. The Listings are examples of medical conditions that "ordinarily prevent a person from

working" in any capacity. *Sullivan v. Zebley*, 493 U.S. 521, 533 (1990) (quotation marks

omitted). A claimant's severe medically determinable impairment(s) "meets" a listing if the

impairment or combination of impairments "satisfies *all* of the criteria of that listing, including

any relevant criteria in the introduction, and meets the [Act's one-year] duration requirement."

20 C.F.R. § 404.1525(c)(3) (emphasis added). "An impairment that manifests only some of those

criteria, no matter how severely, does not qualify." *Zebley*, 493 U.S. at 530. A claimant who

meets a listing is presumed disabled regardless of his or her vocational profile. *Radford v.*

*Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (citing *Bowen v. City of New York*, 476 U.S. 467, 471

(1986)). Thus, satisfying the criteria for a listing requires a claimant to demonstrate more

significant medical impairment than the baseline statutory standard of being unable to perform

"substantial gainful activity." *Zebley*, 493 U.S. at 532.

To meet Listing 1.04(A), a claimant must demonstrate a disorder of the spine, such as

degenerative disc disease, with

> evidence of nerve root compression characterized by (1) neuro-anatomic
> distribution of pain, (2) limitation of motion of the spine, (3) motor loss (atrophy
> with associated muscle weakness or muscle weakness) accompanied by sensory
> or reflex loss and, if there is involvement of the lower back, (4) positive straight-
> leg raising test (sitting and supine).

*Henderson v. Colvin*, 643 F. App'x 273, 276 (4th Cir. 2016) (per curiam); *see* 20 C.F.R. pt. 404,

subpt. P, app. 1 § 1.04(A) (2014). The claimant must also show that he "has suffered or can be

expected to suffer from nerve root compression continuously for at least 12 months."[5] *Radford*,

734 F.3d at 294 (citing 20 C.F.R § 404.1509). He is not, however, required to show that each

medical finding or symptom set out in Listing 1.04(A) presented simultaneously or very close in

time to the others. *See id.* Rather, the claimant can meet the Listing "by showing that he

experienced the symptoms 'over a period of time,' as evidenced by 'a record of ongoing

management and evaluation.'" *Id.* (quoting 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.00(D) (2012)).

ALJ Munday found that Watlington's severe spinal disorders, R. 12, did not meet Listing

1.04(A) because the "record d[id] not consistently establish evidence of motor loss accompanied

---

[5] Although the ALJ did not make any specific findings on this point, it appears that the medical evidence
would not support a finding that Watlington suffered or could be expected to suffer from nerve root
compression for at least twelve continuous months during the relevant period. In December 2011, for
example, Dr. Abram explained that Watlington's second spinal surgery would involve "decompression of
the canal and nerve root at L5-S1 on the right," R. 342, and that an MRI taken shortly after that surgery
showed "no evidence for nerve root irritation or inflammation . . . on the left side at L5 or S1," R. 330.
Dr. Abram also consistently noted that Watlington's surgical hardware remained in good position after his
second surgery. *See, e.g.*, R. 321, 328, 330, 518. Diagnostic images of Watlington's lumbar spine taken in
March 2013 showed that his vertebral body heights were maintained without evidence of acute
abnormality. R. 420.

by sensory or reflex loss and a positive straight-leg raising test (sitting and supine)," R. 14. *See also* R. 20. She also gave "little-to-no weight" to Dr. Cloninger's opinion that Watlington's spinal disorders met Listing 1.04(A) for the sixteen months between April 2013 and August 2014. R. 20–21. ALJ Munday explained that Dr. Cloninger "did not give adequate support from the objective record" for this opinion because he only discussed evidence of "leg weakness[] and limitation of range of motion in [Watlington's] legs and back," whereas Listing 1.04(A) further required "evidence of sensory loss and a positive straight-leg raising test (both sitting and supine)." R. 20. She also found that Dr. Winikur's treatment notes did "not show any evidence of a positive straight leg raising test during the period subsequent to April 23, 2013." R. 21.

The ALJ's conclusion that Watlington's spinal disorders did not meet all the criteria in Listing 1.04(A) is fully supported by the record, which does not contain a positive straight-leg raising test in both the sitting and supine positions. *See Shiplett v. Colvin*, No. 5:15cv55, 2016 WL 6783270, at *10 (W.D. Va. Nov. 16, 2016). Watlington had one "positive seated straight leg raise on the left" in December 2011 (eight months before his alleged onset date), but there is no indication that the test was also performed in a supine position. R. 334. The only other straight-leg raising tests from the relevant period in the record, performed in July and October 2012, were both negative.[6] R. 317, 357. And, as the ALJ correctly found, there is no indication that Dr. Winikur ever performed a straight-leg raising test while serving as Watlington's pain-management specialist. R. 421–86, 544–50.

Watlington argues that "the absence of reference to that test is not unusual, especially given the other objective signs (neuro-anatomic distribution of pain, limitation of motion of the

---

[6] Watlington mistakenly says that "no physician conducted a straight leg raising test post surgery." Pl.'s Br. 5. Dr. Abram and Dr. Fraifeld conducted a total of three straight-leg raising tests after Watlington had his second spinal surgery in December 2011. R. 317, 334, 357. Two of these tests were negative, and one produced tightness, but no radicular pain pattern. *Id.*

spine, motor loss associated with muscle weakness, and sensory loss) demonstrated in the records of Drs. Abrams [sic] and Winikur." Pl.'s Br. 5. Watlington may have the better explanation as to why his doctors did not regularly perform sitting and supine straight-leg raising tests, but the record says nothing about it. The absence of positive findings from both sitting and supine straight-leg raising tests is enough to prevent Watlington from meeting Listing 1.04(A) because the regulation's text is clear that where, as here, "there is involvement of the lower back," the claimant must produce evidence of positive testing in both variations. 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.04(A); *see Shiplett*, 2016 WL 6783270, at *10. Thus, the ALJ's finding that Watlington did not meet Listing 1.04(A) is supported by substantial evidence in the record and must be affirmed.[7] *Shiplett*, 2016 WL 6783270, at *10.

     *2.     RFC Assessment*

     Watlington next argues that the ALJ's RFC determination is flawed because it does not reflect Dr. Abram's and Dr. Winikur's "opinions of Watlington's disability" or Watlington's (and his mother-in-law's) statements describing his back pain and minimal daily activities. *See* Pl.'s Br. 6–8. Watlington asserts that this evidence does not conflict with any other evidence in the record, *see id.* at 4, and conclusively establishes his "inability to perform at even the lightest residual capacity," *id.* at 6. At oral argument, Watlington also objected to the ALJ's RFC determination in that it does not reflect either Watlington's testimony that his medications make him drowsy or Dr. Winikur's opinion that the same medications impair Watlington's ability to function independently. *See* R. 43, 51–52, 426.

     A claimant's RFC represents his "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis" despite his medical

---

[7] Watlington does not argue that his spinal disorders "medically equaled" the severity of any listed impairment. *See generally* Pl.'s Br. 4–9.

impairments. SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted); *see* 20 C.F.R. § 404.1545.

It is a factual finding "made by the Commissioner based on all the relevant evidence in the

[claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per

curiam), and it must reflect the combined functionally limiting effects of impairments that are

supported by the medical evidence or the claimant's credible symptoms (such as pain), *see*

*Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). The ALJ's RFC assessment must also

"include a narrative discussion describing" how medical facts and nonmedical evidence

"support[] each conclusion," *Mascio*, 780 F.3d at 636, and explaining why she discounted any

"obviously probative" contradictory evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567

F.2d 258, 259 (4th Cir. 1977); *see also Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir.

2014).

        ALJ Munday's RFC finding limited Watlington to a range of light work involving

"simple, routine tasks" with additional restrictions on his ability to work in certain environments

or around hazards and to reach overhead, stoop, kneel, crouch, crawl, climb, and push/pull with

the right lower extremity. R. 15. By restricting Watlington to light work, the ALJ also found that

he could still "lift[] or carry[] 20 pounds occasionally and 10 pounds frequently," as well as sit

and stand and/or walk for "about 6 hours in an 8-hour workday." R. 15 (citing 20 C.F.R. §

404.1567(b)). Watlington primarily objects to the finding that he can lift at least ten pounds. *See*

Pl.'s Br. 6. He argues that the ALJ improperly rejected Dr. Winikur's opinion that Watlington "is

able to lift less than 10 pounds with any frequency," *id.*, and misapplied the law when evaluating

"the intensity and persistence of the functional [e]ffects," *id.* at 9, of Watlington's back and leg

pain. *See id.* at 6–8. He also objects that the ALJ "d[id] not mention" some of Dr. Abram's and

Dr. Winikur's treatment notes showing that Watlington repeatedly "complained of lower back

pain with occasional right leg pain" and that those post-operative symptoms were "considered by the treating physicians in their opinions of Watlington's disability." *Id.* at 8. At oral argument, Watlington added that the ALJ failed to consider Dr. Winikur's opinion that Watlington suffers from unidentified "CNS effects" when taking his opioid pain medications and muscle relaxants, which arguably reinforces his own testimony that those medications make him feel drowsy and sluggish. *See* R. 43, 51–52, 426.

### a.   *Treating Source Opinions*

The ALJ must weigh each "medical opinion" in the claimant's record. *See* 20 C.F.R. § 404.1527(c). Medical opinions are statements from "acceptable medical sources," such as physicians, that reflect the source's judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, functional limitations, and remaining abilities.[8] *Id.* § 404.1527(a)(1). The regulations classify medical opinions by their source: those from treating sources, and those from non-treating sources, such as examining physicians and state-agency medical reviewers. *See id.* § 404.1527(c). A treating physician's medical opinion is "entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."[9] *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); *see* 20 C.F.R. § 404.1527(c)(2). If the opinion is not entitled to controlling weight, then the ALJ must determine how much weight to afford the opinion, taking into account factors such as the nature and extent

---

[8] They are distinct from medical-source opinions on issues reserved to the Commissioner, such as whether the claimant is "'disabled' or 'unable to work.'" 20 C.F.R. § 404.1527(d)(1). The ALJ must consider these opinions as she would any relevant evidence, but she need not accord "any special significance" to the source's medical qualifications. *Id.* § 404.1527(d)(3); *see also Morgan v. Barnhart*, 142 F. App'x 716, 722 (4th Cir. 2005).

[9] Watlington does not argue that his treating physicians' medical opinions are entitled to controlling weight. *See* Pl.'s Br. 5–6, 8.

of the physician's treatment relationship with the claimant, how well the physician explained or supported the opinion, and the opinion's consistency with the record as a whole. 20 C.F.R. § 404.1527(c). Although treating physicians' medical opinions often deserve deference, the ALJ may discount or reject such an opinion when there is "persuasive contrary evidence" in the record. *Mastro*, 270 F.3d at 178; *see Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (per curiam); *Hines*, 453 F.3d at 563 n.2. The ALJ must adequately explain the weight assigned to a treating-source medical opinion and the reasons for that weight. *See Radford*, 734 F.3d at 295–96; 20 C.F.R. § 404.1527(c).

Before weighing the available medical-source opinions, ALJ Munday set out an accurate and fairly thorough summary of treatment and physical examination notes from the relevant period. R. 16–20. She noted that the records from Dr. Abram showed that he saw Watlington approximately once a year "during the period at issue" and that the surgeon's treatment notes did "not detail significant physical examinations" on those visits. R. 19; *see* R. 303–04, 310–12, 321, 516–18. The records from Dr. Fraifeld and Dr. Gohar showed that Watlington walked with a normal gait, exhibited normal reflexes and full (5/5) strength in all four extremities, and, with one exception, exhibited full range of motion without reported pain or tenderness in his spine and pelvis. R. 16–17, 19; *see* R. 313–17, 355–59, 411–12. ALJ Munday also acknowledged that Dr. Winikur's treatment notes contained abnormal findings, such as "decreased" range of motion in Watlington's back, diminished (3/5) motor strength in both lower extremities, and, on at most one occasion, an abnormal sensory examination in the L4-L5 dermatomes. R. 17–18, 19; *see* R. 436–37, 456–57, 460–61, 464–65, 474–75, 479–80, 546–47. On the whole, however, the ALJ found Dr. Winikur's treatment notes "generally show[ed] physical examinations (with minimal

changes from exam-to-exam) where [Watlington] was reported to be in no apparent distress and to have exhibited normal upper extremity strength, sensation, and gait." R. 20.

ALJ Munday then summarized and weighed Dr. Abram's and Dr. Winikur's opinions about Watlington's medical conditions and physical limitations. R. 19–20. She gave "little weight" to Dr. Abram's opinions that Watlington "was limited to lifting a maximum of 10 pounds with restricted bending, lifting, and twisting," "had a significant amount of pain which prevents him from working at his normal job," and "was totally disabled and would be unable to resume any work for the foreseeable future." R. 19 (quotation marks omitted); *see* R. 311–12, 512–13, 514, 518. She explained that these opinions were "generally quite conclusory," provided "very little explanation as to [Watlington's] specific functional limitations," and did not make clear whether he "was prohibited from all work or just his former job." R. 19. She also explained that Dr. Abram's and other providers' "treatment notes from the period at issue [did] not consistently show the kind of marked objective abnormalities" that would support such "significant limitations" on Watlington's physical functions. R. 19. Finally, ALJ Munday noted that Dr. Abram "apparently relied quite heavily on [Watlington's] subjective report of symptoms and limitations" and that she found "good reasons" to question the reliability of those subjective statements. R. 19.

The ALJ gave "no weight" to Dr. Winikur's May 2014 opinions that Watlington could lift/carry at most ten pounds; stand for one or two hours; walk for one or two blocks at a time; sit upright for less than six hours per eight-hour day; and only rarely reach in any direction. R. 20; *see* R. 424–25. She explained that these "extreme limitations" were "not consistent with the medical evidence of record, including Dr. Winikur's own treatment notes," which consistently reflect that Watlington "exhibited normal upper extremity strength, sensation, and gait (despite

23

reportedly demonstrating 3/5 lower extremity strength)" on physical examinations. R. 20. She also found that Dr. Winikur's and other providers' treatment and exam notes did "not show the sort of marked abnormalities on physical examinations that would support [such] significant limitations" on Watlington's physical functions. R. 20; *see* R. 16–19.

Watlington challenges ALJ Munday's decision to reject Dr. Abram's and Dr. Winikur's opinions that he can lift at most ten pounds, *see* Pl.'s Br. 6, but he does not identify any error in her analysis or point to any specific piece of evidence not considered by the ALJ that might have changed the weight assigned either to this particular restriction or to the physicians' opinions generally. *See Reid*, 769 F.3d at 865; *Beaudett v. City of Hampton*, 775 F.2d 1274, 1276 (4th Cir. 1985). Instead, it appears that he merely disagrees with how ALJ Munday weighed and resolved conflicting evidence about his impairment-related functional limitations. *See Johnson*, 434 F.3d at 653 ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ."). Broadly construing his objections, however, Watlington appears to argue that ALJ Munday ignored evidence that both physicians "considered" Watlington's repeated complaints of pain and other symptoms as the basis for their "opinions of [his] disability," Pl.'s Br. 8, and that Dr. Winikur's opinion is consistent with the revised August 14, 2014 office note, which contains unidentified "findings supportive of ongoing incapacity or disability," *id.* at 6. Neither objection is persuasive.

First, the ALJ specifically found that Dr. Abram "apparently relied quite heavily on [Watlington's] subjective report of symptoms and limitations," and she cited that finding as a legitimate reason to discount the "conclusory" opinions for which the physician had provided "very little explanation" of his own. R. 19; *see Craig*, 76 F.3d at 590; 20 C.F.R. § 404.1527(c)(3). She also reasonably found that Dr. Abram's own treatment notes from the

24

relevant period did "not detail significant physical examinations" and that other providers'
examination notes did "not consistently show the kind of marked objective abnormalities" that
would "support the significant limitations" Dr. Abram identified in his opinions. R. 19; *see* R.
304, 311–12, 316–17, 321, 357, 411–12, 516–18. Second, ALJ Munday specifically discussed
the revised version of Dr. Winikur's treatment note from August 14, 2014, in her summary of the
medical evidence, and she acknowledged that this version documented several "abnormal"
findings on Watlington's motor and sensory examination. R. 18; *see* R. 546–47. She also
reasonably found that Dr. Winikur's other treatment notes—as well examination notes from Dr.
Fraifeld and Dr. Gohar—documented mostly normal findings on physical and neurological
exams throughout the relevant period and consistently failed to "show the sort of marked
abnormalities" that would support such "extreme limitations" on Watlington's physical
functions. R. 20; *see* R. 316–17, 357, 411–12, 436–37, 456–57, 460–61, 464–65, 474–75, 479–
80. These contrary medical findings provide "specific and legitimate reasons" for ALJ Munday
to reject Dr. Abram's and Dr. Winikur's medical opinions in their entirety, and those reasons are
adequately supported by the record in this case. *Bishop*, 583 F. App'x at 67; *see Craig*, 76 F.3d
at 589–90.

Watlington also takes issue with the ALJ's failure to discuss his medication side effects
when weighing the medical opinion evidence. Although ALJ Munday did not specifically
mention Dr. Winikur's opinion that Watlington should not travel alone "[d]ue to the CNS
effects" of his medications, R. 426, there is no indication that she failed to consider this evidence
when evaluating Watlington's RFC, *see* R. 12, 15–16, 20–23. *Reid*, 769 F.3d at 865 ("[T]here is
no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision."
(quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam))). For example,

the ALJ acknowledged Watlington's testimony that his medications made him drowsy, R. 16, and she explained her reasons for questioning Watlington's subjective complaints that appear throughout the record, including in Dr. Abram's treatment notes. *See* R. 18–19, 21–22. She also said that she rejected Dr. Winikur's opinion in full because his own (and other providers') treatment notes did not support the "extreme" and "significant" limitations he identified in that opinion. R. 20. A few treatment notes from the relevant period contain Watlington's complaints of "fatigue" or "some sleepiness" secondary to his medications, *e.g.*, R. 309, 407, but most do not mention medication side-effects at all, *see* R. 321, 323–24, 325–26, 327–28, 454, 458, 465, 472–75, 477, 482–85, 516–18, 544–48. Dr. Winikur did not document any complaints of "CNS effects" in his treatment notes, and there is no indication that he restricted Watlington's activities or ability to function independently, R. 426, because he prescribed opioids and muscle relaxants. *See* R. 429–37, 450–65, 467–86, 544–49. An ALJ may reject a treating physician's opinion where, as here, she reasonably determines that the doctor's own treatment notes do not support that opinion. *See Bishop*, 583 F. App'x at 67; *Craig*, 76 F.3d at 590; *cf. Justus v. Soc. Sec. Admin.*, No. 4:14cv45, 2015 WL 5510921, at *8 (W.D. Va. Sept. 17, 2015) ("[A] treating physician's failure to impose 'symptom-related functional limitations and restrictions' can weigh against the claimant's credibility." (quoting 20 C.F.R. § 404.1529(c)(3)).

        *b.    Watlington's Credibility*

      The regulations set out a two-step process for ALJs to evaluate a claimant's symptoms.[10] *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017); 20 C.F.R. § 404.1529; *see also* SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996), *superseded on other grounds by* SSR 16-3p, 2016 WL 1119029 (Mar. 2, 2016). "First, the ALJ looks for objective medical evidence showing a

---

[10] "Symptoms" are the claimant's "own description of [his or her] physical or mental impairment." 20 C.F.R. § 404.1528(a) (2015).

condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866; *see also Craig*, 76 F.3d at 594. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *Lewis*, 858 F.3d at 866, to work on a regular and continuing basis, *see Mascio*, 780 F.3d at 636–37, 639. "The second determination requires the ALJ to assess the credibility of the claimant's statements about [his] symptoms and their functional effects."[11] *Lewis*, 858 F.3d at 866.

The ALJ cannot reject the claimant's subjective description of his symptoms "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 404.1529(c)(2); *see also Lewis*, 858 F.3d at 866; *Hines*, 453 F.3d at 565. Rather, she must consider "all the available evidence in the record" bearing on the claimant's allegations that he is disabled by pain or other symptoms caused by a medical impairment or related treatment. *See* 20 C.F.R. § 404.1529(c). The ALJ also must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5). Ultimately, the ALJ's articulated reasons for discounting a claimant's subjective complaints need only be legally adequate and supported by substantial evidence in the record. *See Mascio*, 780 F.3d at 639; *Bishop*, 583 F. App'x at 68 (citing *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)).

---

[11] In March 2016, the Social Security Administration issued a new policy cautioning that this "credibility" analysis should be limited to matters concerning the claimant's symptoms that would affect his ability to work and should "not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." SSR 16-3p, 2016 WL 1119029, at *10. Statements that are internally inconsistent or that are inconsistent with other relevant evidence in the record, however, may lead the ALJ to reasonably "determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities." *Id.* at *7.

As noted, ALJ Munday's RFC finding limited Watlington to light work involving "simple, routine tasks," with additional restrictions on his ability to perform certain postural activities and to work in certain environments. R. 15. At the beginning of her RFC analysis, the ALJ reviewed statements made by Watlington, as well as his wife and mother-in-law, describing his "chronic severe pain in his lower back, right leg, [and] bilateral knees" and how those symptoms affected Watlington's daily activities. R. 16. She also acknowledged Watlington's testimony that "his medications caused a side effect of drowsiness." R. 16. Her written decision included an accurate and fairly thorough summary of the treatment notes and other evidence bearing on Watlington's allegation that he experienced debilitating chronic back pain and other symptoms that limited his functional abilities. *See* R. 16–21. After considering all of this evidence, the ALJ found that Watlington's medical impairments could reasonably be expected to cause his alleged symptoms, but that Watlington's and his relatives' statements describing the intensity, persistence, and limiting effects of those symptoms were "not entirely credible," R. 16, because "the degree of severity alleged lack[ed] support and consistency with the other evidence of record," R. 18.

ALJ Munday gave four reasons supporting that conclusion. R. 18. First, she found that Watlington's medical treatment after July 2012 was "relatively limited and conservative overall" because he had "been treated primarily with medications, which appear[ed] to have been relatively effective in controlling his symptoms." R. 18; *see* R. 17–18. "[I]t is well established in this circuit that the ALJ can consider the conservative nature of a claimant's treatment in making a credibility determination," and "there is substantial evidence in the record to support" the ALJ's decision to consider that as one factor in discounting Watlington's "claim of total disability." *Dunn v. Colvin*, 607 F. App'x 264, 275 (4th Cir. 2015); *see* 20 C.F.R. §

404.1529(c)(3) (2014). For example, Watlington consistently told Drs. Abram, Fraifeld, and Winikur that prescription pain medications and muscle relaxants reduced his symptoms and allowed him to carry out his daily activities. R. 304, 314, 321, 323–24, 326, 328, 355, 454, 458, 465, 472, 477; *see Gross*, 785 F.2d at 1166 ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). The ALJ did not express doubt that Watlington still experienced back and leg pain after his two spinal surgeries, but she did question the severity of those symptoms based on the treatment Watlington sought and received following those surgeries. R. 16–18. The nature of that treatment and the partial relief afforded by conservative post-operative measures are legitimate grounds for the ALJ to question the severity of Watlington's symptoms during the relevant period. *See Gregory v. Colvin*, No. 4:15cv5, 2016 WL 3072202, at *1, *5 (W.D. Va. May 6, 2016) (concluding that the ALJ reasonably found pain medications, physical therapy, and steroid injections constituted "conservative" treatment for degenerative disc disease and properly relied on the nature of such treatment in discounting the claimant's complaints of debilitating lower-back and leg pain), *adopted by* 2016 WL 3077935 (W.D. Va. May 31, 2016).

Watlington counters that the ALJ "fail[ed] to consider" other treatment he received for his back pain, such as the two spinal surgeries in May and December 2011 and the SCS trial in July 2013. Pl.'s Br. 8. Although ALJ Munday focused her inquiry on whether Watlington was disabled on or after July 27, 2012, *see* R. 12–23, she specifically mentioned Dr. Abram's notes from the December 2011 surgery and found that Watlington's "post laminectomy syndrome" and "recurrent lumbar disc herniation status post L5-S1 fusion and multiple diskectomies" were severe impairments that significantly limited his ability to perform basic work activities. *See* R. 12–13, 16 (citing R. 337, 342). Thus, there is no indication that the ALJ failed to consider

relevant medical evidence created several months before Watlington's alleged disability onset date. *See* 20 C.F.R. §§ 404.1512(b)(1), 404.1520(a)(3); *cf. Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012) (explaining that the ALJ's duty to consider all the relevant evidence in the record requires that he give "retrospective consideration" to evidence created after the claimant's date last insured "when the record is not so persuasive as to rule out any link[]" between the claimant's "final condition" and his "earlier symptoms"); *Corcoran v. Astrue*, Civil No. SKG-08-913, 2009 WL 3100350, at *13 (D. Md. Sept. 22, 2009) (concluding that the ALJ properly considered relevant medical evidence in the record which predated the claimant's alleged disability onset date). Nor is there any indication that the ALJ improperly discounted Watlington's complaints of pain because he failed to pursue different or more aggressive post-surgical treatment options where none existed. *See Shiplett*, 2016 WL 6783270, at *12 (citing *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010)); *see also Dunn*, 607 F. App'x at 275 ("[W]e are not presented here with a situation in which there is any suggestion that Appellant required more aggressive treatment yet received conservative treatment for other reasons.").

Watlington is correct that ALJ Munday did not specifically mention that he tried the SCS device for three days in late July 2013. *See* R. 16–20. But she did say "that the whole record was considered, and, absent evidence to the contrary, [I will] take her at her word." *Reid*, 769 F.3d at 865. She also specifically referenced Dr. Winikur's treatment notes from "the period subsequent to April 23, 2013," R. 21, which include the records from the SCS trial. R. 440–53. Many of Dr. Winikur's treatment notes indicated that Watlington chose not to have a SCS device implanted permanently even though it "was effective for reducing his pain" because he did not like the tingling sensation. R. 450–51, 453, 454, 459, 463, 473. And, as noted, Watlington consistently

told Dr. Winikur that medication (oxycodone, naproxen, and Skelaxin) reduced his back pain and other symptoms after this date. *See* R. 454, 458, 465, 472, 477. Thus, even if ALJ Munday overlooked this additional course of treatment, the fact that Watlington tried and rejected the SCS device in favor of continuing his daily medications does not undermine the ALJ's articulated reason for questioning the severity of Watlington's allegedly disabling impairments. *Dydra v. Colvin*, 47 F. Supp. 3d 318, 326 (M.D.N.C. 2014) ("[T]he Fourth Circuit has embraced harmless error review of administrative decisions, such that, if an ALJ erroneously considered or failed to consider some evidence, remand is not appropriate unless the claimant was prejudiced." (citing *Morgan*, 142 F. App'x at 724–25)).

Second, the ALJ found that "repeated physical examinations have failed to consistently reveal abnormal gait or positive leg raising tests, as would be expected," R. 18, given Watlington's complaints "that he suffers from chronic severe pain in his lower back, right leg, [and] bilateral knees," R. 16. This finding is also supported by substantial evidence in the record. For example, although Watlington repeatedly said that most physical movements aggravated his pain, *see* R. 311, 313, 355, 434, 454, 458, 462, 467, 472, his doctors consistently observed that he walked with a normal gait, had full muscle strength in his lower extremities, and exhibited full range of motion without reported pain or tenderness in his spine and pelvis, *see* R. 313–17, 355–59, 411–12. Drs. Abram and Fraifeld also encouraged Watlington to exercise and increase his physical activity after his spinal fusion. *See* R. 309, 324, 328, 357. *But see* R. 312. ALJ Munday reached a different conclusion than Watlington about the severity of his chronic back and leg pain, but she nonetheless acknowledged that his complaints appeared throughout the medical record and, in her RFC assessment, accounted for them to a degree by restricting Watlington's physical and postural activities. R. 15–19. "An individual does not have to be pain-free in order

31

to be found 'not disabled,'" particularly where, as here, the ALJ finds that the claimant can work only "at a lower exertional level" than he did before. *Green v. Astrue*, No. 3:10cv764, 2011 WL 5593148, at *4 (E.D. Va. Oct. 11, 2011) (citing *Hays*, 907 F.2d at 1457–58), *adopted by* 2011 WL 5599421 (E.D. Va. Nov. 17, 2011).

Third, the ALJ cited evidence that Watlington "stopped working for reasons not related to [his] allegedly disabling impairments," R. 18, as a reason "for questioning the reliability of [his] subjective complaints," R. 19. In March 2013, Watlington told Dr. Gohar that he stopped working in 2012 because he was "laid off due to downsizing." R. 409. In August 2014, Watlington confirmed under oath that this statement was correct. R. 39–40. He also testified that he stopped working on July 27, 2012, because he "had some disagreements with management," and not because there were "any issues with [his] ability to perform the job." R. 39. Although Watlington quickly added that he was not "physically able to continue" that work, *id.*, it was ALJ Munday's role to weigh this conflicting evidence and determine which explanation was more persuasive. *See Kearse v. Massanari*, 73 F. App'x 601, 603 (4th Cir. 2003) (per curiam) (noting that the ALJ properly considered claimant's inconsistent statements about the reason he stopped working); *cf. Layne v. Colvin*, No. 5:14cv14, 2015 WL 1958980, at *10 (W.D. Va. Apr. 30, 2015) ("Layne's lack of candor in explaining why she stopped working was a reasonable ground for the ALJ to question her credibility."). Her decision to credit Watlington's initial explanation is supported by substantial evidence in the record, including Watlington's comment to Dr. Abram on June 4, 2012, that he "continues to work full time full duty without specific limitations." R. 321.

Finally, the ALJ found that the daily activities Watlington described in his August 2012 function report were inconsistent with "allegations of disabling symptoms or functional

limitations," R. 19, because at that time he could still care for his dogs, prepare sandwiches or

pour a bowl of cereal, go grocery shopping and out to eat in restaurants, wash dishes, do laundry,

read and watch television, and "exercise on a Bowflex and walk[] on trails 3 times per week

(albeit with some problems due to his pain)." R. 18–19. Watlington does not argue that ALJ

Munday misrepresented his daily activities; he simply disagrees with her conclusion that those

activities undermine his subjective statements because, in his view, they are "minor activities"

that do not indicate he can maintain gainful employment. Pl.'s Br. 7. The Fourth Circuit has

found that a claimant's ability to engage in similar activities—including "caring for his dogs,

watching television, visiting family and friends, attending church services, driving short

distances," and going on an "occasional hunting" trip—supported the ALJ's finding that a

claimant who allegedly suffered debilitating pain could still "perform a limited range of light

work." *Yost v. Barnhart*, 79 F. App'x 553, 555 (4th Cir. 2003) (per curiam). Watlington's

admitted ability to engage in the cited daily activities, albeit with some pain, provided a

legitimate reason for ALJ Munday to question his and his relatives' statements. *See id.*; *Fretz v.

Colvin*, No. 6:12cv44, 2014 WL 533995, at *10 (W.D. Va. Feb. 10, 2014); 20 C.F.R. §

404.1529(c)(3) (2014).

Considering the objective medical evidence, Watlington's course of treatment, his

inconsistent statements about why he stopped working, and evidence of his daily activities, the

ALJ could reasonably question the severity and limiting effects of Watlington's chronic back and

leg pain. Watlington does not "point to any specific piece of evidence not considered by" ALJ

Munday that might have changed her adverse credibility determination or her conclusion that

Watlington's impairments were not disabling. *Reid*, 769 F.3d at 865 (emphasis omitted); *see*

Pl.'s Br. 4–9. Accordingly, I find that the ALJ's credibility determination is legally adequate and

supported by substantial evidence. *See Bishop*, 583 F. App'x at 68 (citing *Eldeco, Inc.*, 132 F.3d at 1011).

At oral argument, Watlington objected to the ALJ's RFC determination in that it did not reflect his testimony that his medications made him feel drowsy and sluggish, or that those side effects could impair his ability to stay on task in a competitive work environment. *See* R. 21–23, 43, 48–49, 51, 70–71. He based this argument largely on Dr. Winikur's comment that Watlington's medications caused unidentified "CNS effects," which, as explained above, the ALJ reasonably rejected because it is not supported by Dr. Winikur's own treatment notes. Watlington did not point to any other evidence in the record establishing that his medications caused specific, measurable limitations that the ALJ failed to consider when evaluating his RFC. R. 21–22, 51, 94, 190, 196, 206, 306, 407, 426; *see Johnson*, 434 F.3d at 658 (explaining that drowsiness is a common side-effect of medication and should not be viewed as disabling unless the record reflects serious functional limitations). And, as explained, although a few treatment notes from the relevant period contain Watlington's complaints of "fatigue" or "some sleepiness" secondary to his medications, most providers' treatment notes do not mention medication side-effects at all. Moreover, the ALJ noted that her RFC finding "was reduced to adequately address" Watlington's impairment-related functional limitations. R. 21. On this record, it was not unreasonable for the ALJ to reject Watlington's purported testimony that he suffered from "constant . . . drowsiness or memory issues," R. 70 (attorney's characterization of Watlington's testimony), when taking his medications, R. 21–23; *cf. Fluellen v. Colvin*, No. 4:14cv30, 2015 WL 2238997, at *4 (W.D. Va. May 12, 2015) (finding no error in ALJ's adverse credibility determination where claimant's medical record showed that she never described the intensity or severity of her "baseline fatigue" and either repeatedly failed to report or expressly denied

34

experiencing the symptoms and treatment side-effects that she described in her hearing testimony), or for her to conclude that limiting Watlington to "simple, routine tasks," R. 15, accommodated sporadic complaints that some of his medications made him tired.

Having independently reviewed the entire record, I find that the ALJ's RFC determination is supported by substantial evidence, including Dr. Surrusco's and Dr. Cloninger's medical opinions; the mostly normal, or minimally abnormal, findings on physical and neurological exams throughout the relevant period; and Watlington's repeated statements to his doctors that, with prescription medications, he could tolerate his pain and other symptoms well enough to perform his daily activities. *See* R. 97–98, 313–17, 321, 355–59, 411–12, 454, 458, 465, 472, 477, 532–35. ALJ Munday's reliance on the VE's testimony in response to a hypothetical question reflecting her RFC determination, R. 22, was also proper. *See Fisher v. Barnhart*, 181 F. App'x 359, 365 (4th Cir. 2006) (per curiam). The VE testified that a person with Watlington's vocational profile and this RFC could perform certain "unskilled light" occupations, such as marker, router, or rental clerk. R. 67–68. Watlington does not object to the VE's testimony or to the ALJ's finding that these jobs exist in significant numbers nationally or in Virginia. Accordingly, I find that the Commissioner's final decision is consistent with the law and supported by substantial evidence in the current record. *Walls v. Barnhart*, 296 F.3d 287, 292 (4th Cir. 2002) (holding that a VE's reliable testimony provides substantial evidence to support the Commissioner's final decision).

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** Watlington's Motion for Summary Judgment, ECF No. 12, **GRANT** the Commissioner's

Motion for Summary Judgment, ECF No. 13, **AFFIRM** the Commissioner's final decision under

42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United

States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel

of record.

ENTER: December 20, 2017

Joel C. Hoppe
United States Magistrate Judge

36